IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs December 17, 2019

**STATE OF TENNESSEE v. MICHAEL POWELL**

**Appeal from the Circuit Court for Rhea County**
**No. 2015-CR-67     J. Curtis Smith, Judge**

_____

**No. E2019-00524-CCA-R3-CD**

_____

A Rhea County Circuit Court Jury convicted the Appellant, Michael Powell, of one count of aggravated statutory rape. The trial court imposed a sentence of three years and nine months in the Tennessee Department of Correction. On appeal, the Appellant challenges the trial court's denial of alternative sentencing. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ALAN E. GLENN, JJ., joined.

B. Jeffery Harmon (on appeal) and Vanessa D. King (on appeal and at trial), Jasper, Tennessee, for the Appellant, Michael Powell.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; James Michael Taylor, District Attorney General; and James W. Pope, III, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

A Rhea County Grand Jury returned a multi-count indictment against the Appellant charging him in counts one through five with aggravated statutory rape and in counts six through ten with especially aggravated exploitation of a minor. The offenses stemmed from the Appellant's relationship with the victim, a sixteen-year-old high school student.

Immediately prior to trial, the State informed the trial court that it would not proceed on the counts of especially aggravated exploitation of a minor.

At trial, the victim testified that she was born on October 8, 1997. She had attended and graduated from Rhea County High School. When asked if she had any health problems, the victim said that she "had seizures."

The victim said that in Summer 2014, when she was sixteen years old, she started a friendship with the Appellant's son, D.P. They attended the same high school, but he was younger than she was. They sent text messages to each other. The victim used a cellular telephone her father had given her. D.P. initially used his own cellular telephone; however, after he "r[a]n out of minutes," he used the Appellant's cellular telephone to send text messages.

The victim said after approximately one month, her relationship with D.P. ended. Nevertheless, she sent a text message to the Appellant's telephone thinking that she was sending the message to D.P. The Appellant responded to her message, initially saying, "hey or how's it going" and later telling the victim that she was pretty. The victim said that she had not met the Appellant when he began sending her messages.

The victim said that she and the Appellant exchanged text messages until January 2015 when her parents found out about the messages. The victim acknowledged that during Fall 2014, she was a junior in high school. While she was at school, she used her friends' cellular telephones to send the Appellant text messages. She said that the Appellant sent her a text message telling her where he lived but that he did not invite her to his house. The Appellant's residence was approximately one mile from the school and was visible from the school. She said that walking from the school to his residence did not take long.

The victim said that she decided to walk to the Appellant's mobile home during a school day because she wanted to see him. The victim explained that each school day had a total of five periods. Initially, she said that she left school during the second and fifth periods to visit the Appellant, then she said that she visited the Appellant at "[l]unchtime." The first time the victim visited the Appellant, they sat on a couch in his living room and "just talked" about her plans after graduation. The Appellant told the victim she was pretty. The Appellant was married, but his wife was not at home, and his son was at school.

The victim said that she "would just decide to go [to the Appellant's residence] sometimes." The Appellant had a dog, but it was not kept inside the residence. During her visits, the victim and the Appellant sat on the couch and talked and sometimes went to his bedroom. The victim recalled that the Appellant had a television, a bed, and a nightstand

in his bedroom. The victim said that when they went into the Appellant's bedroom, the Appellant took off her clothes and had her lie down on the bed and pose while he took photographs of her with his cellular telephone.

The victim said that on other occasions when she visited the Appellant's residence, she and the Appellant had sex on the bed in his bedroom. The victim said that she took off her clothes and that the Appellant took off his clothes. The Appellant touched her "[a]ll over" with his hands. He performed oral sex on her and penetrated her vagina with his penis. She agreed that he "put something over his privates" before penetrating her. The victim acknowledged that she performed oral sex on the Appellant and that he ejaculated. The victim said they had sex four separate times during school periods from September to January. The Appellant did not perform oral sex on the victim each time they had sex, but he did penetrate her vagina with his penis.

The victim said that the first time he penetrated her vagina with his penis, she started bleeding and told him to stop because it hurt. The Appellant stopped, and the victim went to the bathroom to clean up the blood.

The victim said that the Appellant was nice to her, that he said nice things to her, and that on one occasion he gave her money. The Appellant never threatened her, and he never tried to give her alcohol. He tried to give her a white powder, which she refused, saying, "I don't do drugs."

The victim said that the Appellant sent photographs of his private parts to her cellular telephone before the first time they had sex. She identified a photograph of her private parts which the Appellant had taken with his cellular telephone and also identified areas of the Appellant's bedroom. She also described the furniture and other items, such as a guitar, in the residence.

The victim said that in January, her parents learned of her relationship with the Appellant. Her parents had her cellular telephone and saw a text message the Appellant was sending. The victim's father would not return the cellular telephone to her, and she did not have any further contact with the Appellant.

The victim said that she remembered speaking with Investigator Potter and that he asked her about the first time she met the Appellant and what the inside of the Appellant's house looked like. Afterward, the police took her to the Children's Advocacy Center (CAC) in Chattanooga. While there, a woman recorded an interview with the victim, and a nurse performed a physical examination.

On cross-examination, the victim said that she usually left school during her history or English class. She "skipped" class and went to the Appellant's residence only four times. She agreed that the first time, they just sat on the couch and talked. The second time was more than a week after Thanksgiving. On that occasion, they had sex. One week after Christmas, he performed oral sex on her, and she performed oral sex on him. The victim said that she did not remember the date of the fourth visit but knew that they had sex during the visit.

The victim's father testified that he and his wife adopted the victim in September 2003, approximately one month before the victim's sixth birthday. The victim's father said that the victim was a "slow learner," that "it's hard to get her to understand," that she "was diagnosed with ADHD when she was eight," and that she was "developmentally delayed." He said that "[o]nce she was in high school, they did inclusion where she was in with other kids," but while she was in junior high, "she was in special ed classes." He stated, "[I]f you are around younger kids, 10, 12, 14, she blends in with those kids more than she does people her own age."

The victim's father said that the victim would have been almost seventeen years old in October 2014. He did not know that the victim had "struck up a relationship" with D.P. The victim's father drove the victim to Rhea Central, and the victim caught "the bus from there to the high school and then back."

The victim's father said that in January 2015, he was in the living room and heard a text message come through on the victim's cellular telephone. He looked at the telephone and saw that the message was from "Mike, no last name." The message stated that "she was already awake when I got home." The victim's father sent a response asking who was awake. The Appellant responded, "[Y]ou know who I'm talking about." The victim's father went to the victim and asked, "[W]ho is Mike," and the victim told him who was sending the message. The victim's father sent a message asking who was sending text messages to the victim. The Appellant tried to pretend that his son was sending the messages, but the victim's father responded that the victim had told him it was the Appellant and how old the Appellant was. The victim's father said that the Appellant ended the texting at that time. The victim's father "Googled" the Appellant's name and discovered where the Appellant lived and worked.

The victim's father said that he asked the victim about the Appellant. Initially, she said that they were just friends, then she revealed that she had been to his house. The victim's father searched the victim's cellular telephone for additional text messages from the Appellant, but the messages had been deleted. The next day, the victim's father approached Investigator Potter about the relationship between the Appellant and the victim and gave Investigator Potter the victim's cellular telephone.

- 4 -

The victim's father said that he confronted the Appellant about his relationship with the victim outside of La-Z-Boy where the Appellant worked. The victim's father said, "I parked out on the road and motioned for him to pull over when he came out from work that evening." The Appellant refused to get out of his truck. The Appellant said that he had done nothing to the victim. The victim's father tried to convince the Appellant to get out of his truck, but the Appellant refused and drove away.

Rocky Potter, an investigator with the Rhea County Sheriff's Department, testified that he specialized in investigating cases of child sex abuse. On January 14, 2015, the victim and her father came to Investigator Potter's office and told him about the victim's relationship with the Appellant. The victim was sent to the CAC for a forensic interview.

Investigator Potter said that after the victim's interview, he went to the Appellant's residence, which was across from the baseball fields at the high school. Investigator Potter verified the victim had been inside the Appellant's residence by corroborating that several items she said she had seen were there, including the couch in the living room, a knitted afghan on a bed in a bedroom, stringed instruments, and a flat-screen television in the bedroom. Investigator Potter also confirmed the presence of a dog outside the residence. Investigator Potter took photographs while he was inside the residence.

Investigator Potter obtained a search warrant and confiscated the Appellant's cellular telephone. Investigator Potter gave the telephone to Steve Rievley, an investigator with the Dayton City Police Department, so that he could extract data, such as text messages and photographs. Afterward, Investigator Rievley returned the telephone to Investigator Potter.

Investigator Potter said he learned that the victim had been borrowing her friends' cellular telephones occasionally to contact the Appellant. He obtained the names of her friends, went to the high school, spoke with some teachers and parents, and "got statements from some of the children that the phone was used." Investigator Potter learned that the Appellant's date of birth was October 18, 1972; accordingly, in Fall 2014, the Appellant was forty-two years old.

On cross-examination, Investigator Potter said that when he executed a search warrant, he collected four cellular telephones from the Appellant's person and his vehicle. The Appellant "said that some of the phones were older, belonged to his sons, or didn't know who they belonged to." The victim's father gave Investigator Potter the victim's cellular telephone. The victim's father said that he had "cleared everything off of it."

- 5 -

Investigator Steven Rievley testified that he was a member of the Internet Crimes Against Children Task Force and that he performed "cell phone forensics, computer forensics, any sort of technology based [investigations]." Investigator Rievley said that Investigator Potter gave him the Appellant's cellular telephone and asked him to download the information from the device. Investigator Rievley downloaded thirty-three text messages that the Appellant and the victim exchanged between July 5, 2014, and December 15, 2014. Investigator Rievley also found photographs on the Appellant's telephone, but the photographs were not dated.

On cross-examination, Investigator Rievley agreed that deleted data could be retrieved from a cellular telephone.

D.P., the Appellant's son, testified that in Summer 2014, he knew the victim "[s]omewhat" and that they began a "little bit" of a friendship by exchanging text messages. He thought that one of the victim's friends had given the victim his cellular telephone number. At that time, D.P. was living near the high school with his mother, his older brother, and the Appellant. The victim never visited the Appellant's residence while D.P. was there.

D.P. said that when he and the victim began exchanging text messages, he had his own cellular telephone. However, when he "r[a]n out of minutes," he borrowed the Appellant's cellular telephone, received messages from the victim, "deleted the messages and told her not to text back."

D.P. said that his friendship with the victim lasted a month or two. At some point, they stopped exchanging text messages. The Appellant told D.P. that the victim sent him text messages but did not mention that he had responded.

D.P. said that usually roll was taken at the beginning of class but whether roll was taken depended on the teacher. He said that it was not unusual for students to skip classes.

On cross-examination, D.P. said that during the time he lived near the high school, they had a dog that stayed outside on the porch, but they had to get rid of the dog. They also kept two snakes in cages, one in the living room and one in his brother's room. The Appellant was working first shift at La-Z-Boy, which meant he worked "[s]ometime in the morning to sometime in the evening." D.P.'s mother worked third shift, which was at night. D.P. said that each school day ended at 2:50 p.m.

On redirect examination, D.P. agreed that he did not know whether the Appellant had ever worked second shift or had a day off during the week.

A schoolmate, L.R.P., testified that she met the victim in seventh grade and that they went to high school together. L.R.P. said that roll was taken at school in the morning and that some individual classes also took roll. She agreed that if a student were counted present in the morning, the student was "counted there for the whole day." She said it was common for "someone [to] skip a class or two."

L.R.P. said that in Fall 2014, the victim borrowed other students' cellular telephones while at school. The victim usually told L.R.P. that she was using the telephone to contact "one of her friends or her boyfriend she was dating at the time."

Ashley O'Barr Haynes testified that she was a pediatric nurse practitioner and pediatric sexual assault nurse examiner at the Children's Advocacy Center (CAC) in Chattanooga. On January 22, 2015, the victim came to the CAC and eventually told Haynes that she was at the CAC because "somebody raped her" and that "his name was Mike." Haynes asked the victim what "rape" meant, and the victim responded "that it is to force someone to have sex with them." Haynes asked what kind of contact occurred between the victim and Mike. The victim said "that there was oral contact, so where she was forced to perform oral sex on him and then he performed oral sex on her, and then also genital to genital contact." The victim "said that it had happened between seven or eight times."

Haynes said that she examined the victim "head-to-toe," including her anal and genital areas. The examination was normal, which was not unusual, and did not exclude the possibility that the victim had engaged in sexual intercourse. Haynes also tested the victim for sexually transmitted infections and pregnancy, and the results of the tests were negative.

At the conclusion of the State's case-in-chief, the trial court granted defense counsel's motion to dismiss count five of aggravated statutory rape because the victim's testimony, at best, established only four acts of aggravated statutory rape.

The defense's first witness, Teressa Everett, testified that she worked as a human resources manager at La-Z-Boy. She said the Appellant's employment records from September 2014 to January 2015 reflected that the Appellant worked first shift, which was from 5:40 a.m. to 3:20 p.m. and if the shift was working overtime, "it could be as early as 4:45 a.m. to 3:20." Everett said that the Appellant may have occasionally worked Saturdays.

On cross-examination, Everett explained that the records reflected the Appellant's "absentee tracking" for Monday through Friday during the selected time frame. According to the records, the Appellant took September 24, October 23, and November 10 as vacation

days; December 3 and January 9 as personal days; and had an "all-day absence" on October 17. Everett agreed that the records reflected when the Appellant was absent but did not reflect the days he worked. The records also did not reflect when the store was closed for holidays.

Jesse Messimer testified that he was the principal at Rhea County High School. Messimer said that each school day had seven class periods and that attendance was taken at the beginning of each period. Messimer said that the victim's records for the 2014-2015 school year reflected that the victim's attendance was "unverified" during her fourth period class on October 7, her first period class on December 11, her second period class on December 16, and her third period class on January 14. All of the classes were in the morning.

On cross-examination, Messimer agreed that the records "assum[ed] that the teacher called roll for every class" and "that some teachers don't always call roll." Messimer acknowledged that some students skipped class to go to a nearby convenience store before returning to school. Messimer explained that the first four periods were prior to lunch and that the remaining three periods were after lunch. He said that each period lasted fifty minutes and that lunch lasted fifty-five minutes; accordingly, if a student skipped fourth period and lunch, the student could be away from school for almost two hours. Messimer estimated that a student could walk to the nearby trailer park where the Appellant lived in two and a half minutes.

At the conclusion of the trial, the jury found the Appellant guilty of aggravated statutory rape as charged in count two and not guilty of the remaining counts.

At the sentencing hearing, Rebecca Harvey with the Tennessee Department of Correction testified that she prepared the Appellant's presentence report. She said that the Appellant originally was interviewed by another officer but that Harvey took over the case and interviewed the Appellant. Harvey agreed that the report reflected that the Appellant answered the questionnaire but, pursuant to counsel's advice, refused to make a statement.

Harvey said that after she submitted the presentence report to the parties, she received an email from defense counsel stating that additional information needed to be added to the presentence report. Harvey spoke with the Appellant in person and included the information he gave her in an amended presentence report. The Appellant told Harvey that he was employed through Randstad, a temporary employment agency, which Harvey verified with a paycheck stub. The Appellant told Harvey that he had been employed elsewhere when the initial presentence report was filed, but he went to work through Randstad after he had a heart attack, and his previous employer did not offer light duty. The Appellant brought Harvey discharge instructions from Erlanger Health System and a

follow-up appointment he had made with a cardiologist as proof of his heart problems. Harvey said that the Appellant underwent a psychosexual assessment, but she did not give any details relating to the assessment.

Roy True testified that he was retired but that he had been a police officer and a car salesman. True said that he had known the Appellant since the Appellant was nine or ten years old and had taught the Appellant in Sunday School. True "kept in touch" with the Appellant two or three times a year. True opined that the Appellant would do "excellent" on probation.

The trial court found, based upon the trial testimony of the victim's father and Messimer, that the victim had low intelligence and lacked the sophistication of other children her age due to her developmental delays. The trial court found that the Appellant "reasonably should have recognized the victim's disability which was displayed by her demeanor at trial. The victim's mental disability should have been eviden[t] to [the Appellant] when he committed the acts of criminal behavior." The trial court noted that the Appellant took nude photographs of the victim and sent her photographs of his penis. Additionally, the trial court found that the proof at trial "clearly prove[d] by a preponderance of the evidence" that the Appellant had sex with the victim, either vaginal or oral, on at least three occasions other than the one for which he was convicted. The court noted that the incidents occurred over a period of several months.

The trial court sentenced the Appellant as a Range I, standard offender to three years and nine months. In analyzing whether to grant the Appellant an alternative sentence, the trial court considered the Appellant's lack of a criminal record but also considered "the criminal activity as reflected by the three other acts occurring during the time alleged in the indictment and proven by a preponderance of the evidence for which he was not convicted . . . ." Further, the court considered the psychosexual evaluation, which reflected that the Appellant was a "moderate to low risk to re-offend" and that he was "in need of sex offender treatment." The court found that the conviction was for a serious offense and that "denying an alternative sentence will avoid depreciating the seriousness of the offense and is particularly suited to deter others who would likely commit similar offenses." Finally, the court found that granting an alternative sentence was "not appropriate given the facts of this case."

On appeal, the Appellant challenges the trial court's denial of alternative sentencing.

## II. Analysis

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of

reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in

sections -102 and -103 of the Sentencing Act." Id. at 346.

A defendant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a). The Appellant's sentence meets this requirement. Moreover, a defendant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6). The following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), may constitute "evidence to the contrary":

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, a court should consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. See Tenn. Code Ann. § 40-35-103(5).

The Appellant is a Range I, standard offender convicted of a Class D felony; therefore, he is considered to be a favorable candidate for alternative sentencing. The Appellant, citing State v. Hooper, 29 S.W.3d 1 (Tenn. 2000), contends that the trial court erred by denying probation based upon the need for deterrence. We note that in Hooper, 29 S.W.3d at 10-12, our supreme court specifically noted five factors for consideration when denying probation solely upon the basis of deterrence:

1) Whether other incidents of the charged offense are increasingly present in the community, jurisdiction, or in the state as a whole.
. . . .
2) Whether the [Appellant's] crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from the criminal behavior.

- 11 -

. . . .

3) Whether the [Appellant's] crime and conviction have received substantial publicity beyond that normally expected in the typical case.

. . . .

4) Whether the [Appellant] was a member of a criminal enterprise, or substantially encouraged or assisted others in achieving the criminal objective.

. . . .

5) Whether the [Appellant] has previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions.

The trial court also denied alternative sentencing on the basis of the seriousness of the offense. Generally, when denying alternative sentencing based on the seriousness of the offense alone, "'the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree,' and the nature of the offense must outweigh all factors favoring a sentence other than confinement." State v. Trotter, 201 S.W.3d 651, 654 (Tenn. 2006) (quoting State v. Grissom, 956 S.W.2d 514, 520 (Tenn. Crim. App. 1997)).

Our supreme court noted in State v. Sihapanya, 516 S.W.3d 473, 476 (Tenn. 2014), that "the heightened standard of review [from Hooper and Trotter] that applies to cases in which the trial court denies probation based on only one of these factors is inapplicable" when the trial court "combined the need to avoid depreciating the seriousness of the offense with the need for deterrence and the nature and circumstances of the offense." This court has explained that according to Sihapanya,

> if only one factor found in Tennessee Code Annotated section 40-35-103(1) is utilized by the trial court, the trial court must make additional findings. If, however, the trial court bases the denial of alternative sentencing on more than one factor, we review the denial to determine if the trial court abused its discretion.

State v. Robert Allen Lester, Jr., No. M2014-00225-CCA-R3-CD, 2014 WL 5501236, at *5 (Tenn. Crim. App. at Nashville, Oct. 31, 2014).

In the instant case, the trial court found that alternative sentencing should be denied because of the seriousness of the offense and also because of the need for deterrence.

Therefore, based upon Sihapanya, the trial court was not required to make further specific findings.  See State v. Joseph D. Sexton, No. M2017-00735-CCA-R3-CD, 2018 WL 300532, at *4 (Tenn. Crim. App. at Nashville, Jan. 5, 2018).  Further, the trial court denied alternative sentencing based upon the circumstances of the offense.  The trial court noted that over a period of months, the Appellant engaged in sexual activity with the victim, who was developmentally delayed and vulnerable, on three occasions other than the offense for which he was convicted.  We note that the Appellant was acquitted of the three other acts at trial.  However, "a jury's verdict of acquittal does not prevent the sentencing court from considering a defendant's conduct underlying the acquitted charge if proven by a preponderance of the evidence."  State v. Marlon Avery Bussell, No. E2004-01239-CCA-R3-CD, 2005 WL 2043843, at *8 (Tenn. Crim. App. at Knoxville, Aug. 23, 2005) (citing State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000)).  The trial court found that the proof clearly established by a preponderance of the evidence that the other acts occurred.

We conclude that the trial court did not abuse its discretion and that it complied with the purposes and principles of sentencing by denying the Appellant alternative sentencing based upon depreciating the seriousness of the offense, deterrence, and the circumstances surrounding the offense.  See State v. Joshua Michael Ward, No. E2018-01781-CCA-R3-CD, 2019 WL 3244991, at *10 (Tenn. Crim. App. at Knoxville, July 19, 2019).

### III.  Conclusion

The judgment of the trial court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE